STEVEN G. KALAR
Federal Public Defender
Northern District of California
DAVID RIZK
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:   (415) 436-7706
Email:        David_Rizk@fd.org

Counsel for Defendant ARTEAGA-CRUZ

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JONI ARTEAGA-CRUZ,<br><br>Defendant. | **Case No.:** CR 19–00654 VC<br><br>**DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE**<br><br>**Court:**　　　Telephonic<br>**Hearing Date:**　April 29, 2019<br>**Hearing Time:**　2:00 p.m. |

## I.    INTRODUCTION

Joni Arteaga-Cruz will be before the Court on April 29, 2020 for sentencing in this Tenderloin case.  He was arrested in November 2019 and given a state court date—which he dutifully attended, only to be arrested by the federal government and then detained.  Mr. Arteaga-Cruz has been incarcerated at Santa Rita Jail for over four months, since December 2019.  Mr. Arteaga-Cruz grew up in a very poor family in Honduras and remains close to his parents.  His Guidelines are 15-21 months.  Probation recommends 12 months and a day; disappointingly, the government is recommending a Guideline sentence as though the coronavirus pandemic is not a factor.  Mr. Arteaga-Cruz respectfully asks that he be sentenced to time served and five years of supervised

release.  He asks for a sentence of time served given the small amount of drugs at issue, and the health risks he faces during the pandemic at Santa Rita Jail.  While he appreciates that entails significant variance, time served in custody now is harder than it has ever been.  He asks for five years, rather than three, of supervised release as an alternative to a longer custodial term and also as a promise that he intends to stay in Honduras.

## II.    FACTUAL BACKGROUND

Mr. Arteaga-Cruz was born on May 29, 1976 in El Porvenir, department of Francisco Morazán, Honduras, to Evenio Arteaga Cruz and Leila Tomasa Cruz Ochoa.  PSR ¶ 36.  He has three siblings, two sisters, and one brother, all of whom live in Honduras.  *Id.*  Mr. Arteaga-Cruz's family grew up very impoverished.  *Id.* ¶ 37.  According to Mr. Arteaga-Cruz, his father's house was made of adobe and there was no electricity when he was growing up.  Electricity was established with assistance from the government around the year 2000.  Instead, the family used gas for cooking and a little light in the night.  Mr. Arteaga-Cruz sometimes went hungry as a child.  *Id.*  Mr. Arteaga-Cruz's family was particularly poor even compared to their neighbors.  He reports that they were so poor that the temptation to steal food out of necessity was ever-present, but his father firmly taught his children that no matter how hungry they were they must always ask (or beg) for food.

He completed sixth grade before he had to leave his studies to help support the family by working as a *campesino* at approximately age 12.  *Id.*  According to Mr. Arteaga-Cruz, he would have been forced to leave school even earlier, but the teacher spent additional time assisting him with his studies while he worked on the side.  He would have liked to have stayed in school and wishes he could go back now.  His family never owned land of their own; instead, they had to work on land belonging to richer landowners.  *Id.*  The family had no significant property of their own—no vehicles, no stock animals, or other valuable possessions.  To this day, he reports that laborers in Honduras are only making a few dollars a day.  As Mr. Arteaga-Cruz explained during his interview with Probation, the poverty in Honduras is oppressive and drove him, like so many others, to flee.  *Id.*

As noted in the PSR, Mr. Arteaga-Cruz's mother has diabetes that costs the family hundreds of dollars per doctor visit, and his father is elderly and losing his vision.  *Id.*  As his parents' oldest son, Mr. Arteaga-Cruz is their primary and only significant source of financial support.  Mr. Arteaga-Cruz

first came to the United States around 2000.  He spent two years working in Dallas, Texas.  First, he

worked at a company establishing air conditioning units.  For a forty-hour work week, he earned

approximately $225.  He also worked at a car wash, making roughly the same.  Around 2002, a friend

who had lived in Tennessee urged him to move north because the wages were better.  At a

construction job in Tennessee he was able to earn more than double what he was earning in Texas.

When he received his first pay check, he was shocked because he had never had so much money.

Finally, he was able to save some money to send to his family.  Whenever he received his paycheck,

he sent roughly half of his earnings back to his family in Honduras before spending any.  He also

maintained close contact with his family.  He put money on a calling card for his parents back in

Honduras so they could call him every day.

In Tennessee, Mr. Arteaga-Cruz married Sandra Arteaga.  They lived with another couple in a

modest apartment to make money, which was challenging.  Unfortunately, Mr. Arteaga-Cruz also

developed serious alcoholism that interfered with his relationship and his life.  He suffered several

convictions related to drinking in 2002 and 2003.  *Id.* ¶¶ 24-25.  Thankfully, he did not lose his job,

but his drinking continued to be a problem for him in his early twenties.  In a serious lapse of

judgment at age 27, he went to Denver to make money by conducting street-level drug sales.  *Id.* ¶

26.  According to the PSR in his prior illegal reentry case, he was arrested for selling less than a gram

of heroin to an undercover officer in Denver.[1]  He was deported but returned to Tennessee.  After his

Denver conviction, Mr. Arteaga-Cruz felt ashamed and vowed he would never engage in drug sales

again.  Unfortunately, a few years later at age 31, he was caught in an ATF investigation of a firearm

purchase conducted by his brother and another woman.  *Id.* ¶ 28.  There was no evidence he had ever

possessed the gun, but Mr. Arteaga-Cruz was charged with illegal reentry.  *Id.*  As a result of

Guideline provisions that are no longer in force, he received five Criminal History points and a 12-

level Offense Level increase for the drug prior, leaving him with Guidelines of 37-46 months.  The

Court sentenced him to 37 months.  *Id.*  His marriage failed and he was deported.  According to Mr.

Arteaga-Cruz (and consistent with the docket in his case), he remained in Hondruas during the

---

[1] *See United States v. Jony Arteaga-Cruz*, No. CR 07-20236, ECF No. 58 at 5 (W.D. Tenn. Apr. 17, 2008).

DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE
*ARTEAGA-CRUZ*, CR 19–00654 VC

duration of his three years of supervised release and had no violations.

Mr. Arteaga-Cruz has one child from a prior marriage to Gregoria Sevilla, Jose, who now lives in Philadelphia and works in construction. *Id.* ¶ 38. Jose lives with his sister Leticia, also from a prior relationship. *Id.* Finally, Mr. Arteaga-Cruz also has a young son who lives in Honduras. Mr. Arteaga-Cruz is close with his children and was living with Jose and Leticia in Philadelphia before he moved to the Bay Area. In Philadelphia, he worked at Washington Brothers (similar to Home Depot) driving a fork lift for approximately five years. *Id.* ¶ 44. In an effort to earn more money, he followed a friend's advice and moved to the Bay Area to work at a restaurant in Oakland, where a friend was working in the kitchen. Approximately six months ago, he was attacked as he exited a BART station and broke his thumb. *Id.* ¶ 40. He received treatment, but experienced lasting pain, and lost his job as a result. Unable to pay his rent, he made the mistake that he vowed he would not repeat—he resorted to selling drugs on the street. He was arrested in November and has been in federal custody since December 2019. Mr. Arteaga-Cruz has not been able to reach his children or his family in Honduras since his arrest. When deported to Honduras, Mr. Arteaga-Cruz intends to stay there and work on a rustic and unfinished house that he owns.

## III.    SENTENCING GUIDELINES

Mr. Arteaga stipulates to the Guidelines calculation set forth in the parties' plea agreement, which is as follows:

| | |
|---|---|
| Base offense level, U.S.S.G. § 2D1.1(c)(13): | 14 |
| Acceptance of responsibility, U.S.S.G. § 3E1.1: | -2 |
| **Total Offense Level** | **12** |

Mr. Arteaga-Cruz has two prior convictions totaling 5 points, and thus falls into Criminal History Category III. The Guidelines sentence for a Total Offense Level of 12 and Criminal History Category III is 15-21 months.

## IV.    LEGAL STANDARD

The Court is familiar with the directives of *United States v. Booker,* 543 U.S. 220 (2005) and 18 U.S.C. § 3553(a). The Sentencing Guidelines range is not mandatory and the Court has a duty to exercise judgment and discretion in arriving at an appropriate sentence. Importantly, the Court may

not presume the Guidelines range is reasonable. *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam).  Instead, the Court must consider the Guidelines range, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentence disparities among similarly situated defendants.  18 U.S.C. § 3553(a)(1), (a)(4) and (a)(6). In crafting a sentence that is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a), the Court must also consider the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational and vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

## V.      ARGUMENT

Several matters warrant the Court's consideration in connection with Mr. Arteaga-Cruz's request for a sentence of time served followed by five years of supervised release:

*First*, the defense appreciates that under ordinary circumstances, the Court might regard a downward variance from 15 months to time served as unwarranted.  Mr. Arteaga-Cruz's request, however, comes at a time of extraordinary circumstances.  As of now, there are 1,260 coronavirus cases in Alameda County and 43 deaths.[2]  At Santa Rita Jail, according to the Sheriff, there are have been 17 confirmed coronavirus cases among inmates and staff.[3]  Twenty-four inmates are currently positive or experiencing coronavirus symptoms and awaiting test results; thirteen housing units (with an unknown number of individuals) are quarantined due to exposure to the virus.  *Id.*  These numbers likely understate the scope of infections because testing is so limited.  Out of approximately 1,751 inmates, 93 have been tested with nearly a third of those (33) testing positive and some (6) still pending.  *Id.*  Studies in the last several days indicate that the extent of infections may be *vastly*

---

[2] *Coronavirus in California: Map and Case Count*, The New York Times (April 23, 2020), *at* https://www.nytimes.com/interactive/2020/us/california-coronavirus-cases.html (updated regularly).
[3] Alameda County Sheriff, COVID-19 Update (April 22, 2020) *at* https://www.alamedacountysheriff.org/admin_covid19.php.

greater than previously thought due to inadequate testing.[4]  Conditions in the jail are, as the Court is no doubt aware, much worse than usual.  Inmates are in tight quarters, even more so with the closure of North County Jail.  Most units have dozens of inmates living together, with two inmates to a cell.  Access to personal hygiene items is limited, with only those inmates that have certain means able to purchase commissary (better/more soap and other hygiene items).  While the jail has provided each inmate with a mask and one additional bar of soap, it is hardly enough to protect the population.  Additionally, the jail has now restricted all visits to the jail.  No attorney, family, friends, or even experts are allowed into the jail.  Programming at the jail has been discontinued.  Inmates are extremely anxious, and many are trying to stay holed up in their cells to avoid contact.  Mr. Arteaga-Cruz is himself very worried about himself and his family, with whom he has had no contact since his arrest.  He reports that he has been a smoker for nearly twenty years, which is associated with immunodeficiency, a CDC risk-factor.[5]

Counsel contacted a supervisor for the United States Marshal Service who confirmed that while the Bureau of Prisons (BOP) is transferring some inmates from Santa Rita Jail to BOP facilities at the moment, the transfers are limited and subject to a case-by-case determination.  Thus, depending on the length of the sentence Mr. Arteaga-Cruz receives, he will likely have to spend all of it at Santa Rita Jail.  Under ordinary conditions, the jail has less space, worse facilities, fewer programming options, and less access to medical care than BOP facilities.  Unlike other inmates at BOP, as an undocumented immigrant who may be subject to a final removal order, Mr. Arteaga-Cruz likely cannot use earned time credits under the First Step Act for time in a halfway house, on home confinement, or on supervised release, and thus will likely serve a longer sentence than other similarly-situated inmates.[6]  Even if Mr. Arteaga-Cruz is transferred to BOP, conditions in federal

---

[4] *Hidden Outbreak Spread Through U.S. Cities Far Earlier Than Americans Knew, Estimates Say*, The New York Times (April 23, 2020), *at* https://www.nytimes.com/2020/04/23/us/coronavirus-early-outbreaks-cities.html; *see also Far More People May Have Been Infected by Coronavirus in One California County, Study Estimates*, CNN (April 20, 2020), *at* https://www.cnn.com/2020/04/17/health/santa-clara-coronavirus-infections-study/index.html.
[5] Center for Disease Control, Coronavirus Disease 2019 (COVID-19), People Who Are at Higher Risk for Severe Illness (April 23, 2020), *at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.
[6] BOP, First Step Act – Frequently Asked Questions (April 23, 2020), *at* https://www.bop.gov/inmates/fsa/faq.jsp#fsa_time_credits.

prison are also grim.  Social visits have been suspended.[7]  As of April 22, 2020, there were 566

inmates and 342 BOP staff members infected, and 24 inmates have died.[8]  The Department of Justice

(DOJ) and DOJ Inspector General are conducting investigations into facilities where inmates have

died, including at Lompoc, California, where dozens of inmates and staff members tested positive.[9]

Defense counsel has spoken with former clients at BOP facilities who confirm that inmates are scared

and unable to distance or otherwise protect themselves.

 After Mr. Arteaga-Cruz serves his sentence, he will almost certainly be transferred to an

Immigration and Customs Enforcement (ICE) facility at Yuba County Jail for weeks to months.

Several judges on this Court have already started granting temporary restraining orders to release ICE

detainees at Yuba County Jail due to poor conditions and obvious health risks not only to the

detainees, but also to the community.  *See, e.g., John Doe v. Barr*, No. 20-CV-02141 LB, ECF No. 27

at 10-11 (N.D. Cal. Apr. 12, 2020) (order describing conditions of confinement at Yuba and granting

release); *see also Bahena Ortuno, et al., v. Jennings, et al.,* No. 20-CV-02064 MMC, ECF No. 38

(N.D. Cal. Apr. 8, 2020) (order granting release).  These orders recognize that reducing incarceration

at this extremely unusual time promotes public health and thus advances the public's interest:

> Lastly, the Court finds, under the highly unusual circumstances presented, i.e., a global
> pandemic of a type not seen within recent memory, the public interest is served by the
> requested injunction. Specifically, the public interest in promoting public health is served by
> efforts to contain the further spread of COVID-19, particularly in detention centers, which
> typically are staffed by numerous individuals who reside in nearby communities.

*Bahena Ortuo*, ECF No. 38 at 8.  As the Court is no doubt aware, similar efforts are underway at

Santa Rita Jail, at BOP, and nationally.[10]

 In sum, this is an exceptionally difficult to time to serve a sentence.  Time served now is much

harder than time served under normal circumstances and conditions are not likely to change anytime

---

[7] BOP, BOP Implementing Modified Operations (April 23, 2020), *at*
https://www.bop.gov/coronavirus/covid19_status.jsp.
[8] BOP, COVID-19 Cases (April 23, 2020), *at* https://www.bop.gov/coronavirus/.
[9] *DOJ Team Reviewing Conditions at Virus-Plagued Federal Prisons; IG leading Separate Probe*,
USA Today (April 16, 2020), *at* https://www.usatoday.com/story/news/politics/2020/04/16/doj-
launches-review-prison-virus-deaths-infections-mount/5144320002/.
[10] *See, e.g., Alameda County approves early release for nearly 250 inmates at Santa Rita Jail*, San
Francisco Chronicle (March 19, 2020), *at* https://www.sfchronicle.com/crime/article/Alameda-
County-approves-early-release-for-nearly-15144181.php.

soon.  Thus, a multi-month sentence imposed now should be considered a much harsher sanction than it would normally be.[11]  Even if the Court grants Mr. Arteaga-Cruz's request for a time served sentence, he is likely to spend more time in custody.  In view of all this, Mr. Arteaga-Cruz respectfully asks the Court to consider a significant downward variance.  Given the circumstances, additional custodial time is not necessary to mete out sufficient punishment, consistent with the mandate of § 3553(a).

*Second*, as an alternative to incarceration he respectfully suggests a longer period of supervised release.  Following his Tennessee case, Mr. Arteaga-Cruz complied with the conditions of supervised release: he did not return to the United States and did not commit any crimes.  He is committed to complying with the terms of his supervision in this case as well.  He knows that he would face additional charges as well as a supervised release violation if he returns.  Mr. Arteaga-Cruz appreciates that his history of recidivism will concern the Court and submits that a longer period of supervised release is a better guarantor or lawfulness than a longer sentence.  Mr. Arteaga-Cruz's record bears this out.

*Third,* and closely relatedly, deterrence does not justify a longer sentence.  As counsel has argued to the Court in other similar cases, the available data does not support the conclusion that longer sentences promote general deterrence.[12]  Given the particular the circumstances of this case, the concept of specific deterrence also does not make sense.  Prior sentences of six months and 37 months[13] have not in fact deterred Mr. Arteaga-Cruz from returning (although supervised release did deter him for a period).  Here, the reality is that economic incentives overwhelm the deterrent effect (if any) of a longer custodial sentence.  Mr. Arteaga-Cruz and his family face extreme poverty in

---

[11] The government's suggestion that the pandemic should not serve as a windfall for defendants like Mr. Arteaga-Cruz is troublingly oblivious to the actual conditions in custody at this difficult time.
[12] *See, e.g.,* Kelli D. Tomlinson, *An Examination of Deterrence Theory: Where Do We Stand?* FEDERAL PROBATION 80 (3), 33-38 (Dec. 2016) ("Severity of punishment was once thought to deliver the main deterrent effect; the more severe the consequence for law-breaking, the less likely an individual is to commit a crime. However, this assumption has not been supported in the literature.").
[13] The defense submits that thirty-seven months was a very severe sentence for Mr. Arteaga-Cruz's illegal reentry case, although it was the low-end Guidelines sentence.  As noted above, it was driven largely by a Mr. Arteaga-Cruz's drug conviction for selling under a gram of heroin, for which he received a suspended *four-year prison sentence* (he was actually turned over to ICE almost immediately) after his probation was revoked.  PSR ¶ 26.

Honduras, of a kind that is not found in the United States.  This hardship and his role as the primary financial supporter of his parents drove him to this country to find work, and to commit the instant crime.  To be clear, the Court should not conclude that Mr. Arteaga-Cruz came here to finance his family by committing crimes to earn money.  Although he has certainly made mistakes and paid the price for them repeatedly, Mr. Arteaga-Cruz should not be defined by his prior convictions.  Mr. Arteaga-Cruz has primarily been—for *years*—working socially-productive jobs, raising his children, and sending his family in Honduras a large portion of his earnings.  His past criminal history must be seen in this in this light.  Given all this context, the defense submits that the deterrent value of a marginally longer sentence, weighed against the desperation felt by immigrants such as Mr. Arteaga-Cruz, is questionable.  The ordeal of his current incarceration during a global pandemic and near-certain deportation thereafter, followed by five years of supervised release, is sufficient punishment.

*Third,* and finally the details of this offense are not, themselves, while serious, are not as serious as many crimes that this Court sees.  The offense consisted of street-level drug sales that did not involve violence, possession of large quantities of controlled substances, or other particularly aggravating factors.  Mr. Arteaga-Cruz is not an organizer or leader, there is no evidence he had any personal stake in the drug sales, or any discretion.[14]  The government did not even bother to weigh the handful of drugs at issue here.  Mr. Arteaga-Cruz made this mistake because he injured his hand and was out of work.  (The government's speculation that he could have been working legitimately and chose to sell drugs instead is incorrect.)  Thus, while the defense appreciates that his history of recidivism is concerning, the crime itself does not represent a significant escalation in Mr. Arteaga-Cruz's behavior.  It is, at bottom, part of the same pattern: a crime committed out of poverty and desperation.

//

//

//

---

[14] He would have been willing to safety-valve proffer but his 37-month prior sentence precluded his eligibility.

DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE
*ARTEAGA-CRUZ*, CR 19–00654 VC

## VI.    CONCLUSION

Mr. Arteaga-Cruz respectfully asks for a time served sentence followed by five years of supervised release.


Dated:        April 23, 2020                                       Respectfully submitted,

                                                                   STEVEN G. KALAR
                                                                   Federal Public Defender
                                                                   Northern District of California

                                                                            /S
                                                                   DAVID RIZK
                                                                   Assistant Federal Public Defender